BRANSON et al. v. KUTZ et al.

(Circuit Court of Appeals, Third Circuit. April 26, 1901.)

No. 30.

PATENTS—INFRINGEMENT—KNITTING MACHINES.

The Branson patent, No. 333,102, relating to devices for mechanically shifting the needles of circular knitting machines, in order to knit stocking heels and toes, is entitled only to a restricted construction, in view of the prior art, and of the fact that the device shown is of doubtful utility, and has never gone into practical use. As so construed, *held* not infringed.

Appeal from the Circuit Court of the United States for the Eastern District of Pennsylvania.

Joshua Pusey and Edmund Wetmore, for appellants.
Joseph C. Fraley and Frederick P. Fish, for appellees.

Before ACHESON and GRAY, Circuit Judges, and BUFFINGTON, District Judge.

BUFFINGTON, District Judge. The appellants filed a bill in the court below, charging respondents with infringing the first, fourth, fifth, and sixth claims of patent No. 333,102, granted December 29, 1885, to Edwin R. Branson for a knitting machine. The action of that court in dismissing the bill (105 Fed. 974) on the ground of non-infringement is here assigned in error. After due consideration, we are of opinion there was no error, and the decree below should be affirmed. The patent concerns devices for mechanically shifting the needles of circular knitting machines in order to knit stocking heels and toes. Circular knitting machines have long been known in the art, and it was old to accomplish by hand the work sought by this patent to be done by mechanism. Such result had also been attained by automatic mechanical devices prior to the patent in suit, but not by

the particular means or in the mode suggested by Branson's. In circular knitting machines the needles are arranged in longitudinal exterior grooves of a metal cylinder. Each needle has near its lower end a lateral butt, which projects beyond the groove, and is adapted to engage with a cam. The upper end of the needle forms a round-top hook. Just below the throat of the hook is pivoted a thin metallic strip, called a "latch." When turned upward, the latch overlaps the point of the hook. Knitting consists in sliding the needles, one after another, up and down their grooves, and carrying a thread past them in position to be hooked when the needle is up. As the needle descends carrying the thread, the latch is forced up by contact with a loop previously formed around the needle shank, and allows the hook to pass through the loop and shed it. As the needle rises, the hooked thread passes down from the hook to the shank, and in turn becomes a loop. Repetition of these operations results in knitting a tubular fabric consisting of continuous spiral rows of loops, each loop being drawn through the one next to it. The needles are actuated by cams projecting inwardly from the walls of a cam cylinder which surrounds the needle cylinder. These cams are shaped so as to engage the needle butts when rotated in either direction. Knitting can therefore be done continuously by rotary, or to and fro by reciprocated, motion. In the former operation a tubular fabric is knit; in the latter, the cams are carried past a certain number of needles only, and but a part of a tube is knit, the edges being formed by the loops upon the extreme needles actuated. If a needle is pushed so far up or so far down in its groove that its butt is above or below the belt of cam engagement, such needle will remain stationary, simply holding on its shank the loop formed thereon. This position is called the "idle level." The needles within the belt of cam engagement will, however, continue knitting. The leg having been knit, knitting of the heel is effected by raising half the needles to the idle level. The cam cylinder is then reciprocated so as to actuate the half circle of needles which remains on the working level. The needles at the outer ends of this circle are raised one by one to the idle level, so that each successive row of loops is shorter. This gradually narrows the fabric towards the apex of the heel. When this point is reached the process is reversed, and one needle at each end of those on the idle level is dropped to the working level at each oscillation, until the entire half circle of needles has again resumed knitting. When this is done the heel is formed, and, the needles of the idle half circle being simultaneously dropped to the working level, the rotary motion is resumed, and knitting in the regular tubular process goes on. Raising needles from the working to the idle level, and dropping from the idle to the working level, was done by hand. In this state of the art, patent No. 183,167 was on October 10, 1876, issued to one Hollen. This patent was the first to show a pivoted lever with a notched end, adapted to engage the butt of the first needle of an advancing row, and shift such needle to the idle level. In this device upon the outside of a horizontal cam cylinder a lever is mounted having two notches and an intermediate V-shaped projection. The needle butts extend beyond the outer sur-

face of the cam cylinder, and are adapted to engage with the pivoted lever when the latter is thrown into operative position. When in such position the butt of the first needle of the advancing row engages the notch on one side of the projection. As the needle cylinder rotates, the butt turns the lever over, but is itself raised to the idle level by the advance of the lever. The remaining needles of the row advance in order, push the lever forward, and leave it set in a position where, on the return of the row, it lifts the first needle to the idle level by a similar return process. The model from the patent office brought into court showed that Hollen, in a circular knitting machine, effected mechanical shifting of the needles to the idle level in order to narrow. In this state of the art, Branson applied for the patent in suit. His object was, in a vertical machine, to mechanically lift the needles from the working to the idle level to narrow, and to mechanically drop them from the idle to the working level to widen. The mechanism proposed consisted of two notched raising levers, one at each end of the cam and below its level, and two notched dropping levers, one at each end of the cam and above its level. These levers all operated in the way pointed out by Hollen, viz. the first needle of the row engaged the lever notch, carried the lever forward, and was by the lever shifted from the working level, while the needles following remained on such working level. Branson's claims for a lifter were rejected on the Hollen patent. This rejection, acquiesced in by Branson, shows that in the judgment of the office there was no patentable novelty in using two lifting levers instead of one, and in adapting them to a vertical instead of a horizontal machine. The use of such generic levers to serve as droppers mechanically involved providing for the effect of gravity. In view of Hollen's patent, and of the fact noted above that there had existed other devices for accomplishing by automatic devices the result attributed to the patent in suit, by automatically shifting needles from the upper idle to the working level, there may be serious question whether this patent involved patentability; but conceding, for present purposes, its validity, it is quite clear that the novelty of Branson's device must lie in minor details of construction and arrangement. Moreover, it is strongly contended that the patent did not disclose an operative device. This question largely turns on whether the needle-lifting lever, when set, is depressed and raised by virtue of a torsional tension exerted through the spring, m. In the patent, the lifting lever rests on a stop pin, l, which projects through a slot in the cam cylinder. This stop pin is carried on an arm pivoted on the outside of the cam cylinder, and adapted to allow the stop pin to be moved from the lower to the upper end of the slot. The arm is a circular shaped flat spring, and has a retaining pin on it adapted to engage with two openings on the outer side of the cam cylinder, one above the other. This spring presses the retaining pin in the upper or lower opening, respectively, and thus holds the stop pin and the lever resting upon it at the upper end of the slot when it is in operative relation, or at the lower end when it is in inoperative relation. In this operative position the lever would be engaged by the butt of the first needle of the advancing row, and that needle would

be lifted to the idle level; but when it was returned to that position by needle engagement, at the next reciprocating movement of the cylinder, it is quite evident that if it rested without yielding on the pin, 1, and the needles were forced up by its rigid fixed position to such level as to clear it while going in that direction, they would not re-engage it when returning in the opposite one.

It is contended by the complainant that the spring of the patent is so constructed and adjusted that the lifting lever, resting on the pin, 1, is depressed by the returning needles, and they pass over it at this depressed level, and remain on such a level themselves that when they return they are in line to engage the lever, which has been lifted to its normal operative level by the torsional capacity of the spring. No mention is made in the patent of a spring of such torsional capacity, or of an adjustment of parts to effect such torsional effect, and in the detailed description of the working of the machine no such operation is shown. Not only is there an absence of all reference to any yielding of the pin, 1, but the statements of the patent seem to point to the maintenance of the lifting lever in a fixed position. Thus the pin is styled a "stop pin." In describing the adjustment of the lever, but two positions are suggested, "higher or lower in the slot." In these two positions they are "adjusted so as to stand," and such adjustment is stated to be made, not by the torsion of a spring, but "by means of a secondary pin or point," already described, and, for aught the patent states, the only function of the spring is to keep the adjusting pins in engagement with the cylinder holes. Moreover, the arrangements of these adjusting pins are such "that, when engaged with the upper one, the pin, 1, will hold the free end of the lifter, i, elevated or above the plane of the shoulder or flange, a, and when engaged with the lower opening the pin, 1, will allow the end of the lifter to drop below the plane of the shoulder or flange, a, and out of use." The express mention of holding the lifter above the plane, and the omission of any drop below the plane, save when the pin, 1, is lowered, is strongly suggestive that no such yielding adjustment was contemplated. It is also indicative of the patentee's understanding, when he applied for the patent, that he then pointed out as an alternative form of construction one where the lifting lever was maintained in a fixed operative position by a rigid pin. Thus, in his application, as originally filed, he says:

"Other means than the pin, 1, and arm or spring, m, could be used for raising and lowering the end of the lifter, i. A simple pin could be used, suitable openings being provided in the cam cylinders through which the pin could be passed to maintain the end of the lifter in proper position; * * * or any form of device adapted to hold the end of the lifter above the ledge or shoulder, a, or allow it to drop below such ledge or shoulder, could be used."

Not only is no such torsional spring action mentioned in the patent, but it is suggestive that in the machine constructed as late as 1890, which is exhibited as evidence of the possible successful commercial adaptation of the patented device, no spring is used to aid the lifter. The contention that the torsional function of the spring was an afterthought is strengthened by the fact that the

patentee, although aided by an ample capital, failed for several years to produce an operative machine. The testimony of Shirmer is that, four years after the application for the patent, Branson, who was in the employ of the witness, was not able to make his machine work, although assisted by competent mechanics with ample shop facilities. Boyle, an experienced manufacturer, had Branson try it at his works four years later. It proved a failure there. In the next year (1891) a lot of machines were built by the James Smith Woolen Company for Messrs. Emerson & Talcott after a model furnished by them and Mr. Branson. The machine built proved inoperative. That they were properly constructed, and followed the lines of the model, is evidenced by the fact that they were paid for in full by Emerson & Talcott. Indeed, that Branson's machine was only a paper ideal, and that so late as 1886 it was only in an experimental stage, is shown by the fact that an agreement then made between Branson and Emerson & Talcott contemplated the employment of Branson in experimental work upon it, and the expenditure of money in building machines only in case the experimental work should prove satisfactory. The result of this experimental work, after four years, was the construction of the model after which the unsuccessful machines were built by the James Smith Woolen Company. On the whole, we coincide with the opinion of the court below that the machine of Branson's patent "was, at best, of doubtful utility, and never went into practical use"; and we are further of the opinion that a torsional spring was not disclosed in the patent, and that without it the lifting lever was inoperative. In the patented device the lifter is placed inside the cam, and it therefore works across the arc of a circle. The respondents place it outside of the cam cylinder, with an inwardly projecting end adapted to engage the needle butt. The result is that respondents' lifter works externally in a direction tangential to the curve of the cam cylinder, instead of internally, in the chord of an arc. This difference results in better mechanical engagement with the needles, it avoids striking the butts on a dead center, it gives more room for parts, and permits such lever length that the lever throws the needle without turning over past its own center, and therefore does not require to be reset by direct needle action. In pivoting the lifting lever on the outside of the cam cylinder, respondents follow the lines of Hollen, and not complainants' method. It is also to be noted that the construction and relation of parts of respondents' device is such that the lifters are placed upon and in among the knitting cams, instead of at the side of, and "located below, said cams," as specified in the first claim of the patent. Branson's droppers are also located within the cam cylinder. That this was the important feature in his device, and an earmark thereof, is shown by the statement of the specification that "these droppers may be of the form shown, or of any other form adapted to be located between the needle and cam cylinders, and above the needle cams." The depressing levers are pivoted within the cam cylinder so as to overhang the needle butts. The chord of the arc in which the lever swings is necessarily short; otherwise, the lever would strike the

needle cylinder. In the respondents' machine the dropper is mounted outside the cam cylinder, and is opposite the needle cams, instead of being "located above and at one side of the needle operating cams," as specified in the fourth claim. It is not necessary to detail the substantial differences in operation caused by exterior and interior shifter pivoting. In view of the restricted construction which must be given the patent in suit, we are of opinion that its claims cannot be construed to cover the respondents' machine. Its principles and modes of operation are, owing to exterior pivoting, not to mention the means by which shifting is obtained, wholly different from those found in the interior pivoted device of the complainants. The court below rightfully dismissed this bill, and its decree is affirmed.